IN THE UNITED STATE DISTRICT COURT

FOR THE DISTRICT OF IDAHO

CONNIE L. ROBERGE,                          )
                                            )
             Petitioner,                    )        Case No. CV-04-119-N-MHW
                                            )
v.                                          )        **MEMORANDUM DECISION**
                                            )        **AND ORDER**
JO ANNE B. BARNHART, Commissioner           )
of Social Security,                         )
                                            )
             Respondent.                    )
_____ )

Currently before the Court for its consideration is the Petitioner's request for judicial

review (docket # 1) of the Respondent's denial of social security disability benefits, filed March

5, 2004.  Petitioner brought this action pursuant to the Social Security Act (Act), as amended, 42

U.S.C. § 405(g).  The Court has reviewed the Petition for Review and the Answer, the parties'

memoranda, and the Administrative Record ("AR"), and submits its Memorandum Decision as

follows.

**Memorandum Decision and Order  - Page 1**

# I.
# Background.

## A.    Administrative Proceedings.

Petitioner Connie L. Roberge filed applications for a period of disability, disability insurance benefits, and supplemental security income on April 13, 2001.  (AR 161-63.)[1]  She alleged disability since November 2, 1995.  (AR 161.)   The applications were denied initially on May 8, 2001 (AR 99), and upon reconsideration on November 6, 2001 (AR 100).  After a timely request for a hearing was filed on November 26, 2001 (AR 122), Petitioner, represented by counsel Lori Freund, appeared and testified before Administrative Law Judge ("ALJ") R. J. Payne  on October 4, 2002.   Petitioner's husband, Mark Roberge, appeared by affidavit.  Tom Moreland  was requested to testify by the SSA as a vocational expert.  Jay Toews, Ed.D., and Paul Gibb, M.D.  testified as a medical experts.  (AR 39).

ALJ Payne considered the testimony and all other evidence of record, and on November 15, 2002, issued a decision finding Petitioner not disabled within the meaning of the Act, and therefore not entitled to disability insurance benefits or supplemental security income.  (AR 14-29.)  This became the final decision of the Commissioner when the Appeals Council declined to review the ALJ's decision on January 6, 2004.  (AR 6-8.)  20 C.F.R. §§ 404.981, 416.1481 (1991).  Petitioner has exhausted all administrative remedies and is therefore seeking judicial review pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

---

[1]    Petitioner previously filed for benefits on September 15, 1994 (AR 153-56), but her claim was denied on November 23, 1994 (AR 101-03).  She filed for benefits a second time on September 20, 1995 (AR 157-160), but her claim was denied on October 24, 1995 (AR 106-08).

**B.**    **Statement of Facts.**

At the time of the hearing before the ALJ, Petitioner was 47 years old.  (AR 53.)

Petitioner testified that she has a high school education and a 40-hour blueprint reading course.

(AR 55.)   Petitioner's prior work experience consisted of employment as a meter repairer,

housekeeper in a nursing home, and assembler of circuit boards.  (AR 56-60.)  Petitioner alleged

disability since November 2, 1995 (AR 161), due to high blood pressure, ankle and leg edema,

sleep apnea, recurrent foot pain, dermatitis, severe disabling depression, and celiac sprue.  (AR

17.)

Since February, 1986, Petitioner has been treated and/or evaluated by various medical

professionals.  Petitioner began seeing Dr. Patricia Moran at Twin Gables Family Health in

February of 1986, with complaints of bronchitis and sinusitis.  (AR 251-52.)  Petitioner

continued to see Dr. Moran or staff at the clinic several times throughout April and May

primarily with gynecological complaints during which time her obesity and hypertension were

noted.  (AR 252-53.)  Also during this time, Petitioner noted that she was very upset because she

had lost her job because of health problems, and Dr. Moran observed "a very significant

depression."  (AR 253.)  Petitioner was not seen at the clinic again until October and November

of 1986 when she complained of chest congestion and irregular menstrual bleeding.  At that

time, it was noted that sleep studies were needed to rule out a nocturnal sleep disorder.  (AR

254.) Throughout 1987, 1988, and 1989,  Petitioner was treated for recurring gynecological,

sinus, and respiratory problems.  (AR 254-65.)  Her hypertension and obesity were mentioned,

but not depression or problems with missing work during this time.   She was examined by Dr.

Bruce Hopkins of Spokane Obstetrics and Gynecology in August of 1989 who recommended

**Memorandum Decision and Order  - Page 3**

that a D&C be performed if the irregular bleeding could not be regulated with a Provera injection.  (AR 221-22.)  He expressed concern about her hypertension and obesity.  *Id.*  Throughout this time, note was made of hypertension and obesity but not of depression or problems with missing work.

On April 18, 1990, Petitioner complained of a persistent cough and recent problems with depression although stating that work was going well.  (AR 266.)  A two-week trial of Prozac was recommended for depression.  *Id.*  She reported feeling like a new person on May 2, 1990 and had a much brighter affect, so she was continued on Prozac.  (AR 267.)  Throughout the rest of 1990, Petitioner continued on Prozac and sought treatment several times for a persistent cough, bronchitis, and sinusitis.  (AR 271.)   There was no further mention of depression or difficulties with working.

On April 10, 1991, in addition to continued complaints of respiratory problems, Petitioner complained of neck, back, and lower abdominal pain and mentioned that she had lost her job due to time missed from work.  (AR 273.)  Her Prozac was increased, and she returned a week later indicating that both her neck and her depression were better.  (AR 274.)  Petitioner did not visit the clinic again until September 4, 1991.  She complained of gynecological problems but stated that she was doing well on Prozac.  (AR 274.)  She also commented that she was looking for work.  (AR 275.)  Except for chronic sinus and respiratory problems, she had no further complaints throughout the rest of 1991.  (AR 275-76.)

On February 19, 1992, Petitioner complained of persistent pain in her left knee after a fall at work, but had no swelling, giving out, or locking, and she had a full range of motion.  (AR 276; 278.)  She also complained of abdominal cramping, fatigue, and leg cramping.  *Id.*  She was

still on Prozac at that time.  *Id.*  A radiology report of February 20, 1992, indicated a moderate sized bone spur above the left knee.  (AR 460.)

On March 26, 1992, Petitioner complained of ear pain, sinusitis, fatigue, chronic cramping, and a variety of other symptoms.  (AR 277.)  She was diagnosed apparently for the first time with probable irritable bowel syndrome.  *Id.*  She also reported increased depression and concerns about losing her job because she was always sick.  *Id.*  The doctor advised that she would not approve time off from work unless she saw Petitioner initially.  She recommended that Petitioner try to work unless she had a fever and recommended counseling for her depression and marital problems.  *Id.*  Her medication for depression was changed from Prozac to Zoloft.  *Id.*

On July 23, 1992, Petitioner reported that her depression was better back on Prozac.  (AR 280.)  On September 11, 1992, she complained of increased low back pain but no respiratory problems although she continued to have irregular bleeding and was missing "much" work.  *Id.* Although she was tender over the lower lumbar spine, the neurologic status of her lower extremities was intact.  *Id.*  A "very flat affect" was noted.  *Id.*  In November, she noted cough, ear pain, sore throat, irregular bleeding, fatigue, and "some" symptoms of depression.  (AR 279.)

Petitioner was not seen again until March 18, 1993, at which time she complained of fatigue, persistent cough, dyspnea[2], possible urinary tract infection, and wheezing.  She also reported she was at  the point of losing her job due to missing work.  (AR 279.)  She was still on Prozac and was quite tearful.  (AR 282.)  A week later, her labs were "excellent" and she was

---

[2]  Difficult or labored respiration.  Medline Plus, www.nlm.nih.gov/medlineplus/dictionaries.

**Memorandum Decision and Order  - Page 5**

doing better.  *Id.*  In May, when she was seen for a rash that was diagnosed as a probable reaction to medication, she advised that she was not working and had some symptoms of irritable bowel syndrome.  *Id.*

On August 24, 1993, Petitioner was diagnosed with pneumonia.  (AR 281.)  She showed continued improvement in followup checkups in September.  *Id.*  She continued on Prozac.  *Id.* She was referred to Dr. Covelli on August 27 for an evaluation of pneumonia and asthma.  (AR 313.)  The examination confirmed pneumonia, bronchial asthma, severe obesity, and severe depression.  (AR 314.)

On September 1, 1993, Petitioner was discharged from Kootenai Medical Center with a diagnosis of pneumonia.  (AR 223-28.)  Petitioner stated she had been ill for about six weeks. (AR 225.)

Throughout November, 1993, she had several weight and blood pressure checks before being seen again on December 23, 1993 for bronchitis, sinusitis, and ear pain.  (AR 283.)  She was having trouble sleeping and having an extremely hard time motivating herself to go to work which the doctor noted had been a frequent component of her depression.  However,  her affect was quite bright.  (AR 284.)

Petitioner was given Paxil on March 15, 1994, for no stated reason.  (AR 284.)  In April, she returned with complaints of coughing, chest cramps, and dyspnea but indicated that she was not using her inhalers.  (AR 284-85.)  On April 18, 1994, Petitioner was examined by Dr. Frederick Ambrose, a gynecologist, regarding her dysfunctional uterine bleeding.  (AR 214.)  He recommended Provera every 4 to 6 weeks with a biopsy or transvaginal ultrasound if she should have significantly heavy bleeding.  *Id.*

**Memorandum Decision and Order  - Page 6**

By the end of April, 1994, Petitioner complained that she was not doing well depression-wise on the Paxil, so she was given samples of Effexor.  (AR 285.)  In May, 1994, she reported she lost her job due to absences but noted that she was doing quite a bit better on the Effexor.  *Id.*  Her affect was "really quite bright."  *Id.*  However, in July, she was feeling weak, fatigued, and was sleeping too much.  Her Effexor was increased.  (AR 286.)

Dr. Moran submitted a letter to Disability Determinations on October 5, 1994, outlining multiple medical problems, the combination of which make it impossible to maintain gainful employment.  (AR 446-47.)  Dr. Moran stated that Petitioner had a history of morbid obesity which aggravated her problems of hypertension, degenerative joint disease, irritable bowel syndrome, and asthma.  Furthermore, she had a history of recurrent bronchitis and asthma.  *Id.*  Treating the asthma with steroids aggravated her hypertension.  *Id.*  Dr. Moran also referred to Petitioner's history of "quite significant depression and anxiety."  *Id.*  Treatment and testing for all conditions was limited due to lack of funds.  *Id.*

On November 3, 1994, she was given a Prozac sample for no stated reason.  (AR 286.)  In February, 1995, Petitioner had generally been doing quite well and was working as a caretaker for the elderly.  (AR 286.)  Her irritable bowel symptoms were helped by medication.  *Id.*  By April, Petitioner reported a recurrence of menstrual problems.  *Id.*  On April 27, 1995, she reported that she had much stress at her job and was not sleeping well but indicated that medicine "markedly improves" her irritable bowel symptoms.  (AR 287.)  She exhibited a flat affect and appeared fatigued.  *Id.*  The doctor prescribed medication to help her sleep.  On May 11, 1995, she reported that the medication was not helping her sleep adequately and said that she

planned to quit her job due to a high level of stress.  *Id.*  A new medication to assist sleeping was prescribed.

On May 22, 1995, Petitioner advised that she had quit her job, had increased abdominal cramping, intermittent diarrhea, and was sleeping somewhat better on the new medication.  (AR 287.)  On July 3, 1995, she exhibited "quite bright affect" and said that she was trying to get out more and that medication was helping her bowels.  (AR 288.)  However, on August 12, 1995, when being seen for bronchitis,  she reported that she had stopped her Prozac several weeks earlier with a marked increase in depressive symptoms.  *Id.*  She was restarted on Prozac.  *Id.* She also reported irritable bowel syndrome symptoms.  *Id.*  Five days later, her bronchitis had improved but was still experiencing irritable bowel syndrome symptoms.  *Id.*

On August 16, 1995, Dr. Moran submitted a letter indicating Petitioner's complicated medical history with ongoing problems.  (AR 448.)  She concluded that the combination of obesity, recurrent bronchitis with bronchospasm, recurrent bouts of depression with marked inability to function, and her other chronic medical problems of asthma, dysfunctional uterine bleeding, irritable bowel syndrome, hypertension, and degenerative joint disease with chronic pain in her knees and ankles made it extremely difficult for her to be employed on a regular basis. *Id.*

On August 17, 1995, Dr. Moran sent a letter of referral to Dr. Arnold Cohen pertaining to her symptoms of irritable bowel syndrome.  (AR 449.)  The letter referred to Petitioner's hypertension as being moderately well controlled and her depression as "quite severe" .  *Id.*

A pelvic ultrasound on August 18, 1995 was within normal limits and indicated the urinary, bladder, and kidneys were normal.  (AR 465.)

**Memorandum Decision and Order  - Page 8**

On August 31, 1995, Petitioner was still having "quite marked dyspnea" with exertion but otherwise was doing fine.  (AR 295.)  However, she wanted to discuss filing disability papers.  *Id.*  She was seen for depression on October 2, 1995 at which time a possible psychiatric consult was discussed.  *Id.*

On October 5, 1995, Petitioner was examined by Dr. Arnold Cohen, a gastroenterologist, who recommended a gastrointestinal panendoscopy and colonoscopy for her probable irritable bowel syndrome and dyspepsia[3].  (AR 398-99.)  She reported irritable bowel attacks of approximately once a month.  *Id.*

On October 13, 1995, Dr. Moran referred Petitioner to Dr. Frederick Ambrose for a consult regarding her irregular bleeding despite treatment with Premarin and Provera.  (AR 450.) On October 18, 1995, Dr. Moran again wrote to Disability Determinations regarding Petitioner's multiple medical problems as outlined in the prior letter making gainful employment difficult. (AR 451.)   For the first time, Dr. Moran mentioned a history of fibromyalgia.  *Id.*  She indicated that Petitioner responded quite well to antidepressants but that the depression is easily exacerbated by acute illnesses or outside stress.  *Id.*

On October 20, 1995, Dr. Arnold Cohen performed a gastroscopy which indicated chronic gastroesophogeal reflux, erosive escophagitis, and moderately severe gastroduodenitis[4], and a colonoscopy which suggested irritable bowel syndrome.  (AR 393-94.)  Dr. Cohen recommended Prevacid for the acid reflux and adding Imodium to the Doxepin she was already taking to prevent diarrhea rather than to react to it.  *Id.*

---

[3]  Indigestion.  *Id.*

[4]  Inflamation of the stomach and duodenum.  *Id.*

On November 16, 1995, Dr. Cohen wrote a letter to Disability Determinations about Petitioner's chronic peptic ulcer disease, severe gastroduodentitis, long history of diarrhea, and diagnosis of gluten enteropathy or sprue requiring long-term maintenance therapy. (AR 400.) On November 22, 1995, she had quite a bright affect and was doing fairly well emotionally although she had quite marked fatigue and mood swings. (AR 295.) However, her disability claim had recently been denied. *Id.* Testing had shown a sensitivity to gluten and she was starting a gluten-free diet. *Id.*

On November 29, 1995, when Petitioner complained of pharyngitis, there was discussion of upcoming D&C and gastrointestinal problems, but none of her mood or depression. (AR 289.) In December, she was experiencing increased neck pain and headache, but her irritable bowel symptoms were improved after trying a gluten free diet. *Id.* Her blood pressure was fine, and she had "quite bright affect." *Id.* Her reflexes, gait, and Romberg[5] were negative, and she was prescribed neck exercises. *Id.*

Also in late November, 1995, Dr. Frederick Ambrose, whom Petitioner had seen in 1994, recommended a D&C due to her unresolved dysfunctional uterine bleeding which he performed on December 7, 1995. (AR 242-47.)

On January 2, 1996, Dr. Jeffrey Stevens conducted a psychiatric evaluation of Petitioner. (AR 248-50.) He diagnosed atypical depression versus bipolar disorder mixed, type II, and recommended discontinuing Prozac and trying Effexor which had had a tremendously positive affect on her sister. *Id.* He wanted to see her within a month with a copy of all of her medical

---

[5] A test for the presence of Romberg's sign by placing the feet close together and closing the eyes. Romberg's sign–a diagnostic sign of . . . diseases of the nervous system consisting of swaying of the body when the feet are placed close together and the eyes are closed. *Id.*

records.  *Id.*  However, on January 23, 1996, Dr. Stevens indicated that she had had a very poor

response to the Effexor and he switched her to Serzone.  (AR 706.)  She appeared "fairly blah,"

"not good and not bad."  *Id.*

On February 20, 1996, Dr. Stevens reported that Petitioner's mood had improved on the

Serzone.  (AR 707.)  However, on March 21, 1996, Petitioner reported problems with the

Serzone, and Dr. Stevens added Wellbutrin.  *Id.*

On October 16, 1996, Petitioner had a new patient evaluation with Dr. Barbara

Dougherty (AR 296-97.)  At the time, Petitioner had discontinued all but her hypertension

medication.  *Id.*  There was some concern regarding her difficulty with depression, but she had

stopped seeing Dr. Stevens.  *Id.*  Dr. Daugharty's assessment was morbid obesity, hypertension,

and chronic depression.  She recommended that Petitioner not restart her depression medications

due to starting a diet on Phen-Fen but to continue on her hypertension medication.  *Id.*  A month

later, Petitioner was having marked difficulty with depression and they discussed it at great

length.  (AR 297.)  No change in current medical regimen was planned.  *Id.*  On December 11,

1996, Petitioner was doing poorly with depression, and Dr. Daugharty recommended a follow-up

evaluation with Dr. Stevens.  (AR 298.)  Dr. Daugharty was unwilling to prescribe either pain

medication or antidepressants because of past problems with medications.  *Id.*

In March, 1997, Petitioner saw Dr. Arnold Cohen (whom she had last seen in late 1995)

regarding her gluten enteropathy and peptic disease.  (AR 401.)  She reported that all of her

symptoms improve when she adheres to the gluten free diet but that she periodically breaks the

diet.  *Id.*  She had recently had a severe exacerbation of peptic disease after being off all

medications.  She responded well to Prevacid, but Dr. Cohen recommended an upper

gastrointestinal  small bowel follow through.  On March 25, 1997, Petitioner had an upper GI

and small bowel follow through indicating everything within normal limits with no ulcer or

small bowel findings of sprue seen.  (AR 407.)  *Id.*  At a followup exam on October 22, 1997,

Petitioner stated she was adhering to the diet as much as she could and reported that overall she

was feeling much better and symptoms have improved.  (AR 402.)

On December 8, 1997, Petitioner again saw Dr. Covelli whom she had seen in August,

1993.  She was evaluated for increasing dyspnea on exertion and history of asthma.  (AR 318.)

Various tests were normal, and Dr. Covelli suggested significant weight reduction, discontinuing

of inhalers, and sleep studies to determine if she had sleep apnea.  (AR 319.)

On September 4, 1998, Petitioner was examined by Dr. Arnold Cohen whom she had last

seen in March, 1997.  (AR 403.)  She reported that her gastrointestinal complaints dramatically

improved with a gluten free diet although she continued to have intermittent cramping.  *Id.*  She

was doing very well on Prevacid for the gastroesophageal reflux with only occasional minor

breakthrough.  *Id.*

On November 6, 1998, Petitioner saw Dr. Brad Brososky complaining of neck pain, and

she was referred to physical therapy.  (AR 487.)  On November 18, 1998, Petitioner had an

initial evaluation at HealthSouth regarding physical therapy for  neck pain and fibromyalgia.

(AR 306-08.)  A 4-6 week course of physical therapy was recommended with an aquatic

program.  *Id.*  She continued requesting pain medication during the rest of November.  (AR 487-

88.)

From January 22 through June 16, 1999, Petitioner was treated by Dr. Brososky for

hypertension and some minor difficulties.  (AR 489-96.)

**Memorandum Decision and Order  - Page 12**

On June 3, 1999, Petitioner was evaluated by Duane R. Anderson regarding neck, upper, and lower back pain.  (AR302-05.)  X-rays revealed mild to moderate degenerative changes of the whole spine.  His assessment was post-traumatic degenerative arthritis aggravated by obesity and depression.  (AR 303.)

On June 29, 1999, Petitioner called Dr. Brososky for pain medication for lower back pain which continued into July.  (AR 496-97.)  On July 2, he recommended medication and physical therapy for her worsening lower back pain.  (AR 498.)   On July 20, she returned complaining of knee pain and ankle edema.  (AR 499.)  Dr. Brososky recommended physical therapy and medication adjustment.  *Id.*  By July 30, 1999, her ankle swelling and back pain was better although she had not gone to physical therapy due to financial concerns.  (AR 500.)  Dr. Brososky readjusted her medication.  *Id.*

On October 1, 1999, Petitioner was seen by Dr. A. E. Esau, an associate of Dr. Brososky, complaining of 2 to 3 months of intermittent dizziness.  (AR 502.)  He recommended further blood pressure management and medication adjustment.  *Id.*  However, on October 5, 1999, she returned to see Dr. Brososky complaining of dizziness and ankle edema, and medications were once again adjusted.  (AR 503.)  On October 15, 2005, Petitioner was tested for diabetes because of her stated concerns, but lab results were negative.  (AR 504-05.)

On October 25, 1999, Petitioner returned to Dr. Cohen a year after her last visit.  (AR 404.)  Once again, he indicated that her symptoms significantly improved when she followed a gluten free diet and she responded well to Prevacid.  *Id.*  However, because of bowel changes and the fact that she had not been evaluated since 1995, Dr. Cohen recommended further testing.  *Id.*

**Memorandum Decision and Order  - Page 13**

In November of 1999, Petitioner saw Dr. Brososky twice for bronchitis and possible sinusitis.  (AR 506-07.)

On November 22, 1999, Petitioner was evaluated by Dr. Thomas R. DeTar, an ear, nose, and throat specialist, for inner ear problems after complaints of dizziness.  (AR 299-301.)  His assessment revealed no obvious problems, but he ordered an ENG to document the full function of her vestibular system to completely rule out inner ear problems.  *Id.*

On December 3, 1999, Petitioner saw Dr. Brososky complaining of waking up with a lot of fairly intense right knee pain (as opposed to her usual mild chronic knee pain) for which he referred her to physical therapy and prescribed pain medication.  (AR 509.)  As a result, on December 6, 1999, Petitioner had an initial evaluation at Health South for a physical therapy program for osteo-arthritis and right medial meniscus injury.  (AR 309-11.)  She reported having trouble getting out of bed and getting up and down the stairs.  A four-week program was recommended with a prognosis of "fair."  *Id.*

On December 10, 1999, Petitioner saw Dr. Brososky complaining of swollen legs and feet, and medication was adjusted due to worsening ankle edema and stiffening of her neck.  (AR 508.)

On December 17, 1999, Petitioner saw Dr. Brososky complaining of a cough that had been intermittent for six months (AR 510) and again on December 27, 1999 complaining of swollen feet.  (AR 511.)  She indicated that the last episode of swelling and pain in both feet was two years ago.  It had happened a total of 4 or 5 times in the past.  They were "very discrete" episodes that lasted about two weeks.  *Id.*  Medication for pain was advised as well as lab work.  *Id.*

**Memorandum Decision and Order  - Page 14**

On January 21, 2000, Petitioner visited Dr. Brososky complaining of foot pain which had improved slowly and cough which had worsened.  (AR 512.)  She was shaky, nervous,  ready to cry spontaneously, and nervous about leaving the house.  *Id.*  Her husband was ready to take her to the "psych unit."  *Id.*  Dr. Brososky noted worsening depression and recommended staying on Prozac but adding Doxepin to help her sleep.  *Id.*

Petitioner followed up again with Dr.Covelli (whom she had last seen in December 1997) on February 14, 2000 for problems of dsypnea, shortness of breath, and asthma.  (AR 336.)  He noted that she was in no obvious distress unless ambulating.  *Id.*  His assessment was morbid obesity, history of asthma which was causing upper airway wheezing, severe reflux, shortness of breath, and hypertension.  He stopped two of her medications and again recommended nocturnal oximetry[6] to be followed by a sleep study if the oximetry was abnormal.  *Id.*

On March 31, 2000, Dr. Brososky adjusted medications because of possible glaucoma which Prozac can influence.  (AR 513-14.)  He noted she will discontinue Prozac.  (AR 514.)

On April 20, 2000, Dr. Cohen noted new diagnosis of glaucoma.  He indicated she had never appeared for the small bowel studies or repeat upper and biopsies recommended at the last visit in October of 1999.  (AR 405.)  She was exhibiting the same symptoms this time and indicated a willingness to have the procedures.  *Id.*  On May 11, 2000, Petitioner underwent a small bowel series which indicated no abnormalities.  (AR 413.)

On May 16, 2000, Petitioner visited Dr. Brososky for recurrence of right foot pain that he suspects is gout.  (AR 515.)  He noted she was walking very slowly, limping, and using a cane. *Id.*

------

[6]  Measurement of the blood's oxygen saturation by means of an oximeter.  *Id.*

**Memorandum Decision and Order  - Page 15**

A polysomnography sleep study was performed on June 6, 2000, indicating severe obstructive sleep apnea, mild arterial desaturation, and frequent arousals and awakenings secondary to apneic episodes.  (AR 340-41.)   It was recommended that she use a CPAP machine for sleeping, and on June 14, 2000, she reported that she was tolerating the therapy very well and had noticed an increase in her energy level.  (AR 360.)

On July 4, 2000, Petitioner was seen in the Kootenai Medical Center emergency department complaining of painful, swelling  feet.  (AR 416-17.)  It was determined the cause was venous insufficiency.  *Id.*  X-rays revealed no fracture or severe degenerative changes in her left foot.  *Id.*

On July 14, 2000, Petitioner followed up with Dr. Brososky for her foot pain.  (AR 516.)  He referred her to a podiatrist for an evaluation.  *Id.*  Because her mood had become a lot worse since stopping Prozac, he restarted it.  *Id.*

On August 11 and 18, 2000, Petitioner's husband called with concerns about her worsening depression.  (AR 517-18.)  On August 25, she visited Dr. Brososky and stated she was seeing Dr. Stevens, a psychiatrist, next week.  She still had foot pain but had been noncompliant with podiatry appointments.  (AR 520.)

From August 30 through September 5, 2000, Petitioner was hospitalized at Kootenai Medical Center for severe depression with despondency, appetite and sleep loss, and panic attacks with agoraphobia[7].  (AR 361-92.)   Upon discharge, her mood was bright, her affect was bright and pleasant.  (AR 361.)  Final diagnosis was major depressive episode, panic disorder

---

[7]  Abnormal fear of being helpless in a situation from which escape may be or embarrassing that is characterized initially often by panic or anticipatory anxiety and finally by avoidance of open or public places.  *Id.*

with agoraphobia, personality disorder with passive traits, morbid obesity, celiac sprue, hypertension, pre-diabetes, early glaucoma, osteoarthritis, wheat allergy, eczema of right hand and right foot, sleep apnea, and potassium deficiency syndrome secondary to diuretics. *Id.* Dr. Callahan noted that Petitioner had done remarkably well, the depression appeared to have lifted, and her prognosis appeared to be very good. *Id.*

During her hospitalization, she indicated that she had worked as a nurse's aide but that she would become extremely depressed when patients would die. (AR 363.) She stated that she had tried work on various occasions and eventually just left jobs because she felt uncomfortable around people. *Id.* She had problems sitting and standing. (AR 364.) Her depression has increased since the death of her grandmother two years earlier. (AR 363-64.) She stated she had frequent anxiety attacks and was house-bound. (AR 365.)

On August 31, 2000, during her hospitalization, Petitioner had a consultation with Dr. John Pennings regarding surgical intervention for weight reduction. (AR 369-72.) He noted that Petitioner had recently worked as a nurse's aid but has been recently having difficulty holding onto a job due to escalating medical problems. (AR 370.) Dr. Pennings' diagnostic impression was severe morbid obesity in the category of ultra obese. (AR 371.) He further noted that she had nearly all of the comorbidities that one can have in association with obesity. *Id.* He concluded that she should have the surgery. (AR 372.)

On September 4, 2000, also during her hospitalization, she was presented to the emergency department from the psychiatric department complaining of chest discomfort. (AR 421.)

Following the hospitalization, Petitioner visited Dr. Brososky on September 8, 2000. He noted that her life had "done a 180 degree turn," her depression had dramatically improved, and her chronic back pain improved with proper management. (AR 521.) He noted that her affect was very bright and she "looks like a new person." *Id.*

On November 17, 2000, Petitioner advised Dr. Brososky that she was applying for disability because she cannot stand more than 2-3 minutes because of severe pain in her low back, pain in her left knee, and severe disabling depression. (AR 525.)

On November 26, 2000, Petitioner went to the emergency room at Kootenai Medical Center complaining of back pain. (AR 426-27.) Lab work was unremarkable, and she was discharged with Lortab which provided some relief and instructions to follow up with her regular physician. *Id.*

Two days later, Petitioner saw Dr. Jeffrey Stevens, a psychiatrist, for the first time since 1996. (AR 559.) She reported that she felt better after her hospital stay but returned home to some problems. *Id.* She was extremely lethargic and complained of sleep apnea and multiple arthritis and back problems. *Id.* She had not been using her CPAP machine. *Id.* Dr. Stevens indicated she had done well on Prozac but it may have "pooped out" on her. *Id.* He diagnosed major depression, recurrent, and probable social anxiety disorder and continued her current medications pending review of hospital and Dr. Brososky's records. *Id.*

On December 8, 2000, Petitioner complained to Dr. Brososky that her back pain had become worse. (AR 525.) She also complained that her depression was bothering her again although it was not as bad as before. *Id.*

**Memorandum Decision and Order - Page 18**

On December 21, 2000, Dr. Stevens reported that Petitioner was doing "okay" emotionally.  (AR 560.)

On January 12, 2001, Petitioner saw Dr. Brososky complaining of worsening ankle edema and back pain.  (AR 526.)  She wanted pain medication, but Dr. Brososky would not prescribe any opiods for her back and recommended back exercises instead.  *Id.*

On January 18, 2001, Dr. Stevens reported that her mood was "okay" although she was very tired and frustrated.  (AR 560.)  They discussed possible stomach surgery to address her weight, and he continued her on Prozac.  *Id.*

January 19, 2001, Dr. Arnold Cohen, whom Petitioner had last seen in April of 2000, performed an esophagogastroduodenoscopy and colonoscopy.  (AR 395-96.)  The EGD indicated chronic gastroesophageal reflux, active ulcerative esophagitis with sliding hiatal hernia, antral gastritis, and pancreatic rest.  *Id.*  The colonoscopy revealed hemorrhoidal disease as a source of intermittent rectal bleeding.  *Id.*

On February 2, 2001, Petitioner saw Dr. Brososky complaining of pain in her right lower rib cage from a fall that morning.  She was in no acute distress and was able to get up from a chair and up to the examining table.  (AR 527.)  On the same day,  Petitioner was admitted to the Kootenai Medical Center emergency department complaining of right rib pain from fall.  (AR 441-43.)  The assessment was acute bilateral hand and knee abrasion/contusion, acute right elbow contusion/abrasion, and acute right rib fracture.

On February 9, 2001, Petitioner still was having a lot of rib pain, so she saw Dr. Brososky (AR 528.)

**Memorandum Decision and Order  - Page 19**

On February 27, 2001, Dr. Stevens reported that Petitioner was doing "okay" but still having some anxiety problems and some difficulty with depression, but he recommended that she continue the current medications.  (AR 561.)  He suggested Provigil to assist with her significant daytime sleepiness.  *Id.*  On March 6, 2001, Petitioner called Dr. Stevens to indicate that she had run out of Prozac and would start Serzone.

On March 15 and March 28, 2001, Petitioner was treated by a podiatrist, Dr. David Maiani for cramps in her feet.  (AR 477.)   On March 18, March 21, April 8, April 27, and June 1, 2001, Petitioner was admitted to the Kootenai Medical Center emergency room complaining of severe headaches and migraine headaches.  (AR-431-40; 579-85.)

During that same time period, Petitioner also saw Dr. Brososky on a number of occasions complaining of headaches (AR 529-33), and on March 23, 2001, her affect was somewhat flattened and she seemed more depressed.  (AR 530.)

On March 27, 2001, Petitioner reported to Dr. Stevens that she felt "very much like a new person on the Provigil."  She was doing well on the Serzone.   (AR 561-62.)   However, on April 24, 2001, she was not feeling well at all but it was difficult for Dr. Stevens to determine if she reacting to her disability, her husband, or some other process.  He switched her back to Prozac.  *Id.*  However, on May 22, 2001, Dr. Stevens switched her back to Serzone.  (AR 562.)  On June 19, 2001, Petitioner reported anxiety attacks, lots of pain, and depression.  The Serzone was not working.  *Id.*

July 15, 2001, Petitioner was admitted to the emergency department at Kootenai Medical Center complaining of headache and chest pain.  (AR 428-29; 586-87.)  EKG and labs were

essentially normal and she was discharged with instructions to continue taking Prevacid for acid reflux and demerol and phenegran for her headache.  *Id.*

On August 7, 2001, Petitioner's husband advised Dr. Stevens that she may need to be hospitalized.  (AR 563.)  On September 5, 2001, Petitioner suggested going back on Prozac. (AR 681.)  Dr. Stevens indicated difficulties due to the number of physical problems and the medications for those problems.  He further indicated that he would start reducing her medications on the next visit.  *Id.*

On September 17, 2001, Petitioner was admitted to the North Idaho Behavioral Center at Kootenai Medical Center for evaluation of depression and suicidal ideation.  (AR 630-63.)  Her mood had been getting progressively worse to the point that she had confined herself to her room.  (AR 632.)  Her medication was changed from Serzone back to Prozac, and she and her husband received counseling.  (AR 630.)  Her discharge diagnoses were major depressive disorder, recurrent, in partial remission; dysthymic disorder; and panic disorder with agoraphobia, in partial remission.  (AR 631.)

In November and December, 2001, Petitioner reported to Dr. Stevens that she was having difficulty with anxiety.  (AR 683.)

On February 7, 2002, Petitioner reported to Dr. Stevens that she was still having a lot an anxiety and was afraid to leave the house.  However, he indicated that she seemed to be doing a little bit better on the Prozac.  (AR 683.)

On April 8, 2002, Dr. Stevens discussed with Petitioner's attorney his review of Petitioner's records along with all of her other medical records.  (AR 684.)  He indicated that they were "not terribly convincing regarding depression although I suspect she certainly was

depressed.  Most of her complaints were centered around somatization[8] related issues.

Consequently, I have no way of authenticating by personal experience." *Id.*

On April 9, 2002, Dr. Stevens reported Petitioner was sad and unhappy and experiencing

some "full-blown" paranoia.  (AR 684.)

Petitioner was admitted to the Kootenai Medical Center emergency department numerous

times in 2002 for headaches, right foot pain, left foot fracture, cough, chest pain, and the like.

(AR 588-629.)

## II.
## Findings of the Administrative Law Judge.

In the decision issued following the hearing (AR 17-29), the ALJ made specific findings

as follows:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through December 31, 1999.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant has an impairment or a combination of impairments considered "severe" based on the requirements in the Regulations 20 C.F.R. § 404.1520(b).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

---

[8] Conversion of an emotional, mental, or psychological problem to a physical complaint.  *Id.*

6.    The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 C.F.R. § 404.1527).

7.    The claimant has the residual functional capacity to perform a wide range of light work activity within the limitations set forth within the body of the decision.

8.    The claimant's past relevant work in assembly (printed circuit board), did not require the performance of work-related activities precluded by her residual functional capacity (20 C.F.R. § 404.1565).

9.    The claimant is a "younger individual" (20 C.F.R. § 404.1563).

10.    The claimant has a "high school education" (20 C.F.R. § 404.1564).

11.    The claimant's medically determinable ankle and leg edema, high blood pressure, sleep apnea, and foot pain, do not prevent the claimant from performing her past relevant work.

12.    In the alternative, although the claimant's exertional limitations do not allow her to perform the full range of light work, using Medical-Vocational rules 202.20, 202.21, and 202.22 as a framework for decision-making, there are a significant number of jobs in the regional and national economies that she could perform. Examples of such jobs include work as Cashier II (Regional 30,000, Idaho 9,000, National 500,000); Assembly (Regional 20,000, Idaho 6,000, National 400,000); Document Preparer Microfilm (Regional 3,000, Idaho 900, National 50,000); Charge Account Clerk (Regional 10,000, Idaho 6,600, National 200,000); Zipper Trimmer (Regional 1,000, Idaho 500, National 61,000); Cuff Folder (Regional 500, Idaho 150, National 55,000); and Surveillance System Monitor (Regional 4,000, Idaho 800, National 70,000).

13.    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 C.F.R. § 404.1520(f)).

### III.

**Standard of Review.**

The Petitioner bears the burden of showing that disability benefits are proper because of the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A); *Rhinehart v. Fitch*, 438 F.2d 920, 921 (9th Cir. 1971). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

On review, the Court is instructed to uphold the decision of the Social Security Commissioner if the decision is supported by substantial evidence and is not the product of legal error. 42 U.S.C. § 405(g); *Universal Camera Corp. v. National Labor Relations Board*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Meanel v. Apfel,* 172 F.3d 1111, 1113 (9th Cir. 1999) (as amended); and *DeLorme v. Sullivan,* 924 F.2d 841, 846 (9th Cir. 1991). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971). It is more than a scintilla but less than a preponderance, *Jamerson v Chater,* 112 F.3d 1064, 1066 (9th Cir. 1997), and "does not mean a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 108 S. Ct. 2541, 2550, 101 L. Ed. 2d 490 (1988).

The Court cannot disturb the Commissioner's findings if they are supported by substantial evidence, even though other evidence may exist which supports the petitioner's

claims.  42 U.S.C. § 405(g); and *Flaten v. Secy of HHS,* 44 F.3d 1453, 1457 (9th Cir. 1995).

Thus, findings of the Commissioner as to any fact, if supported by substantial evidence, shall be

conclusive.  *Id.*  It is well-settled that if there is substantial evidence to support the decision of

the Commissioner, the decision must be upheld even when the evidence can reasonably support

either affirming or reversing the Commissioner's decision, because the Court "may not substitute

[its] judgment for that of the Commissioner."  *Verduzco v. Apfel,* 188 F.3d 1087, 1089 (9th Cir.

1999).

        In reviewing a case under the substantial evidence standard, the Court may question an

ALJ's credibility assessment of a witness's testimony; however, an ALJ's credibility assessment

is entitled to great weight, and the ALJ may disregard self-serving statements.  *Rashad v.

Sullivan*, 903 F.2d 1229 (9th Cir. 1990).  Where the ALJ makes a careful consideration of

subjective complaints but provides adequate reasons for rejecting them, the ALJ's well-settled

role as the judge of credibility will be upheld as based on substantial evidence.  *Matthews v.

Shalala*, 10 F.3d 678 (9th Cir. 1993).

        The Social Security Commissioner has established a five-step evaluation process in order

to determine whether a person is disabled for purposes of awarding disability benefits.  20 C.F.R.

§§ 404.1520, 416.920 (1996)*; Lester v. Chater,* 81 F.3d 821, 828 n. 5 (9th Cir. 1995); *Bowen v.

Yuckert*, 482 U.S. 137, 140-42, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987).

         First, the Commissioner determines whether the claimant is engaged in substantial

gainful activity.  If the claimant is engaged in such activity, disability benefits are denied.  20

C.F.R. §§ 404.1520(b), 416.920(b).   The ALJ determined that the Petitioner was not involved in

any substantial gainful activity.  (AR  28.)

**Memorandum Decision and Order  - Page 25**

Otherwise, the Commissioner proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments.  A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c), 404.1529(d)(1); and 416.929(d)(1).  If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.   The ALJ here found that Petitioner Roberge's  impairments of ankle and leg edema, high blood pressure, sleep apnea, and foot pain did  significantly limit her ability to engage in basic work activities and therefore did constitute a severe impairment.  (AR 28.)

If the impairment is severe, the Commissioner proceeds to the third step of the evaluation process to determine whether the claimant has an impairment which meets or equals those contained in the Listing of Impairments found in Appendix 1, Subpart P, Regulation No. 4.  20 C.F.R. §§ 404.1520(d); 416.920(e).  Appendix 1 contains a list of impairments which would prevent a person from engaging in substantial gainful employment.  If a claimant can show he or she is limited by such an impairment, disability is presumed.   The ALJ here determined that Petitioner did not possess the findings upon examination which are required in order for disability to be predicated on medical considerations alone, and that Petitioner's impairments did not meet or equal the severity of any of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.  (AR 28.)

If the impairment is not one that is presumed to be disabling, then the Commissioner proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past, i.e. whether the claimant has sufficient residual functional capacity to tolerate the demands of any past relevant work.  If the

claimant is able to perform past work, a finding of "not disabled" is made and disability benefits are denied.  20 C.F.R. §§ 404.1520(e), 416.920(e).  Here, the ALJ found that Petitioner could return to her past relevant work in assembly (printed circuit board).  (AR 26, 28.)

Despite his finding, in the interest of judicial economy, the ALJ proceeded to the fifth and final step to determine whether the claimant can perform other work in the national economy in light of his or her age, education, and work experience.  The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities. 20 C.F.R. §§ 404.1520(f), 416.920(f).

In the instant case, the ALJ determined from the evidence that the Petitioner did retain the residual functional capacity for a wide range of light work activity  within the limitations set forth in the body of the decision  because she is able to stand and walk up to 2 hours ast a time in an 8-hour day with normal breaks, she can lift 10 pounds frequently and 20 pounds occasionally. (AR 26.)  The ALJ noted that Petitioner is further limited in that she should avoid concentrated exposure to temperature extremes, noise, dust, vibration, humidity, wetness, fumes, odors, chemicals, gasses, unprotected heights, and hazardous machinery.  (AR 26 .)  The ALJ noted that Petitioner should also avoid climbing ramps, stairs, ladders, ropes, scaffolds; balancing and crawling; and is limited to only occasional crouching, kneeling, and stooping.  (AR 26.)  On the basis of this review, the ALJ determined that Petitioner was not disabled within the meaning of the Act.

**IV.
Issues Raised.**

The primary issue before the Court is whether the final decision of the Secretary is supported by substantial evidence and whether it is based on proper legal standards.  *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992).  Petitioner contends that the ALJ erred in the following respects:

1)      By finding that Petitioner was not totally credible regarding her functional limitations.

2)      By ignoring the testimony of Mark Roberge.

3)      By finding Petitioner has the residual functional capacity to perform a wide range of light exertional level work.

The Court will take each argument in order.

## A.      Credibility

Petitioner argues that Petitioner's statements regarding her functional limitations based on depression are credible and supported by the medical evidence available to the ALJ at the time of the hearing.  Respondent argues that the medical evidence demonstrated that Petitioner's depression was controlled by medication prior to the alleged onset date and that Petitioner's statements and testimony about the extent of her depression during the relevant period were excessive.

The ALJ must give clear and convincing reasons for discrediting a claimant's testimony regarding the severity of symptoms where they are not supported by objective medical evidence. *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998).  *See also Smolen v. Chater*, 80 F.3d 1273, 1281-82 (9th Cir. 1996).  The Court must affirm the ALJ's decision where the evidence reasonably supports either confirming or reversing it.  *Batson v. Commissioner*, 359 F.3d 1190, 1196 (9th Cir. 2003) (citing *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999)).  "If the

**Memorandum Decision and Order  - Page 28**

ALJ's credibility finding is supported by substantial evidence in the record, [the Court] may not

engage in second-guessing." *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002).

In this case, the ALJ found that Petitioner's psychological problems did not pose more

than a minimal limitation on her "ability to perform basic work-related activities *during the*

*relevant time in question*." (AR 23.) The stated basis of his opinion was (1) that the records

from 1985 to 1996 indicate that her depression was better after taking Prozac; (2) that she did not

receive psychiatric treatment from January 1996 until August 2000 when she was discharged

from the hospital in a bright mood and had bright and pleasant affect; (3) that at discharge it was

noted that her depression had lifted and she was motivated for further treatment; (4) that in

November of 2000 the medication was working and she was able to go out and do things; and (5)

that her treating physician was not a specialist in psychiatry. (AR 25.) The ALJ made this

determination after consideration of all of the medical records dating from 1986 to 2002,

Petitioner's testimony, and the testimony at the hearing.

The ALJ gave clear and convincing reasons for discrediting Petitioner's testimony. It is

undisputed that Petitioner has suffered from depression since 1986 and that at times it was worse

than at others. Although the ALJ's statement that Petitioner last sought psychiatric treatment in

January, 1996, Petitioner actually saw Dr. Stevens twice in January, once in February, and once

in March, 1996. The only other mention of depression as a problem during the relevant period,

though, was in October through November, 1996. However, it is notable that Petitioner had

discontinued all medication at and during that time. For the rest of the relevant period, there was

no further mention of problems with depression. There is ample evidence in the record that

when Petitioner was compliant with her medication she did not experience significant problems with depression.

Of note, is Dr. Stevens' comment in April of 2002, after reviewing his records and all of Petitioner's other medical records, that they were "not terribly convincing regarding depression." (AR 684.)

The other psychological problem referred to by Petitioner is anxiety or panic disorder. However, other than generalized references to anxiety, often in connection with fear of losing a job, the medical records indicate that anxiety and panic disorder did not become a problem until August of 2000.  (AR 517-18; 361-92.)  Although it persisted into 2002, it was not present during the relevant period.

In addition, there is evidence of credibility problems in general which can be considered by the ALJ.  Petitioner stated that celiac sprue caused her to need to use the bathroom frequently and that she sometimes could not make it in time.  (AR 62.)  However,  Dr. Cohen prescribed medication at that time to prevent diarrhea instead of react to it.  (AR 393-94.)  Also, the medical records indicate that once she started a gluten-free diet in the fall of 1995, her symptoms improved.  (AR 289.)  There is no mention of sprue symptoms again until Petitioner saw her gastroenterologist over a year later in March of 1997.  At that time she said all of her symptoms improve when she adheres to the gluten-free diet, and testing indicated no small bowel findings of sprue.  (AR 401; 407.)  Seven months later, in October of 1997, Petitioner reported that she was adhering to the gluten-free diet as much as she could and her symptoms had improved.  (AR 402.)   A year later, in September of 1998, Petitioner reported yet again that her gastrointestinal complaints dramatically improved with a gluten-free diet although she continued to have

intermittent cramping.  (AR 403.)  Finally, in October of 1999, Petitioner once again reported

that her symptoms improved when she followed a gluten-free diet.  (AR 404.)  Despite a

recommendation of further testing because of some bowel changes, Petitioner did not undergo a

small bowel series until May of 2000.  (AR 404-05; 413.)   The tests indicated no abnormalities.

(AR 413.)  That was the last mention of irritable bowel syndrome or celiac sprue in the medical

records that go up through 2002.  Clearly, there is nothing in the record to corroborate

Petitioner's testimony.

Petitioner also testified to migraine headaches occurring during the relevant period.  (AR

63-64.)  However, a review of the record indicates that although Petitioner experienced many

migraines, the migraines did not start until March of 2001.  Contrary to Petitioner's testimony,

migraines were not a problem during the relevant period.

Petitioner also testified to visual disturbances due to glaucoma during the relevant period.

(AR 63-64.)  However, visual disturbances are not mentioned at all, and glaucoma is not

mentioned until March and April of 2000.  Contrary to Petitioner's testimony, visual

disturbances and glaucoma were not a problem during the relevant period.

There are other instances of conflict between Petitioner's testimony and the medical

records that catalogued her contemporaneous complaints.  However, those mentioned above are

sufficient to support the ALJ's determination that Petitioner's recollection of the physical and

mental impairments from which she was suffering during the insured period, made some 34

months after the expiration of the insured period, were not credible.

Accordingly, the Court finds that the ALJ's and the Appeals Council's decision in this

regard is supported by substantial evidence and that the decisions should not be reversed.

B.      **Testimony of Mark Roberge**

Petitioner argues that the ALJ erred in not even mentioning, much less considering, the affidavit of Mark Roberge.   Mr. Roberge was scheduled to testify at the hearing, but due to time constraints, the ALJ and counsel agreed that his testimony would be submitted by way of affidavit.  (AR 93.)  Petitioner argues that Mr. Roberge's testimony corroborated hers regarding her limitations during the relevant time period.   Petitioner's argument is based on the premise that lay testimony regarding a claimant's symptoms must be considered unless by the ALJ unless he specifies reasons for disregarding it.

Respondent argues that there was no need for the ALJ to specifically discuss the affidavit in determining her residual function capacity.  Respondent's position is that the ALJ need not provide reasons for rejecting lay witness testimony that is unsupported in the medical record.  Although Respondent states that Dr. Toews considered Mr. Roberge's statement in concluding that Petitioner's depression was not severe enough during the relevant period, that would appear not to be the case.  The statement was not presented until after the hearing.

The ALJ must take lay testimony regarding a claimant's symptoms into account or else expressly disregard the testimony and state legitimate reasons for doing so.  *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996) (finding error where ALJ failed to include testimony of claimant and his wife regarding her coughing symptoms or expressly state that he would discount their testimony and give legitimate reasons).  Respondent's reliance on *Vincent v. Heckler*, 739 F.2d 1393, 1395 (9th Cir. 1984), as was the Government's in *Nguyen*, for the proposition that it is not error for the ALJ to disregard lay testimony without giving specific reasons if it conflicts with the medical evidence, is misplaced.  As the Court in *Nguyen* pointed

out, *Vincent* involved lay witnesses making medical *diagnoses* rather than testifying about *symptoms*. *See Nguyen*, 100 F.3d  at 1467.  Lay testimony regarding symptoms or how impairment affects ability to work is competent evidence and cannot be disregarded without comment.  *Id.*  Accordingly, the ALJ erred in not either considering the testimony of Mark Roberge or stating reasons for disregarding it.  However, it appears that Mr. Roberge's testimony suffers from the same credibility problems as those of Petitioner.  He testified that he could not get Petitioner to the doctor during the relevant period (AR 217),  yet the record shows that Petitioner visited one doctor or another at least 35 times during that  period not counting several visits from January through June of 1999 for hypertension and minor difficulties.  (AR 242-50, 289 295-311, 318-19, 400-04, 407, and 487-511.)   He testified that Petitioner worked mainly for Kelly Services, a temporary agency, and her jobs always ended as she was beginning to have breathing and lung/pneumonia problems so she was able to get over those problems before starting another job.  (AR 217.)  On the other hand, Petitioner stated that she lost jobs because of her illness.  (AR 253, 273, and 286.)  Mr. Roberge also testified that migraines were a problem during the relevant period (AR 218-19) whereas the medical records show that she did not start having migraines until after the relevant period.    Although Mr. Roberge corroborated Petitioner's testimony in large part, her testimony was contradicted by the record, which led to the ALJ's giving less weight to her testimony as part of his credibility assessment.

Accordingly, the Court finds that the ALJ's and the Appeals Council's decision in this regard is supported by substantial evidence and that the decisions should not be reversed.

## C.    Residual Functional Capacity

Petitioner argues that she cannot perform any type of work on a full-time, consistent basis. She claims it was error for the ALJ not to take into account her severe mental impairments and their effect on her activities. She further contends that because of her exertional and non-exertional impairments that are supported by her treating doctors, her testimony, and the testimony of her husband, she is unable to perform substantial gainful activity at any exertional level for any consistent period of time. Finally, she contends that the ALJ's finding is inconsistent with the vocational counselor's opinion.

Respondent argues that the ALJ made his determination based on the evidence as a whole giving appropriate weight to the medical evidence and testimony. Respondent further argues that in determining Petitioner's residual functional capacity, the ALJ was not required to accept Petitioner's testimony regarding her limitations as long as he properly discounted it.

Having determined above that the record supports the ALJ's finding that Petitioner was not totally credible, it follows that the ALJ was free to give greater weight to the medical records and the testimony of the expert witnesses in determining Petitioner's residual functional capacity.

The ALJ's hypothetical regarding Petitioner's residual functional capacity was based on substantial evidence. The issue is not whether Petitioner is now disabled, but whether Petitioner was disabled during the relevant time period.

Accordingly, the Court finds that the ALJ's and the Appeals Council's decision in this regard is supported by substantial evidence and that the decisions should not be reversed.

**Memorandum Decision and Order  - Page 34**

## V.
## Conclusion.

Based on its review of the entire record, the Court finds that the Commissioner's decision is supported by substantial evidence and is not the product of legal error.  Therefore, the Commissioner's decision finding that the Petitioner is not disabled within the meaning of the Social Security Act should be affirmed.

DATED: **July 12, 2005**



_____
Honorable Mikel H. Williams
United States Magistrate Judge